FILED

2008 Oct-01  AM 10:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **TIMOTHY R. CROSS,** | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 3:07-CV-1522-KOB** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner,** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Plaintiff Timothy R. Cross applied for disability insurance benefits  and supplemental security income payments on  March 30, 2005.  The Commissioner denied the claims. The claimant then requested and received a hearing before an Administrative Law Judge. The ALJ held a hearing on October 20, 2006. In a decision dated November 29, 2006, the ALJ found that the claimant was not disabled within the meaning of the Social Security Act, and, therefore, was not eligible for DIB or SSI payments. The claimant then applied to the Appeals Council for review.  On June 21, 2007, the Appeals Council denied the claimant's request for review. This denial constituted the final decision of the Commissioner of Social Security and the exhaustion of the claimant's administrative remedies. The case is now before the court for judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383 (c)(3).

Based on the court's review of the record in the case and the parties' briefs, the court will AFFIRM the decision of the Commissioner.

1

## ISSUES PRESENTED

The claimant presents the following issues for review:  whether the ALJ properly considered the claimant's age and the transferability of his skills, whether the ALJ's residual functional capacity findings are based on substantial evidence, and whether the ALJ adequately considered the claimant's obesity.

## STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited.  This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*.  The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 401 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record which support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

2

## LEGAL STANDARDS

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above question leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

"Transferability of skills is an issue only when an individual's impairment(s), though severe, does not meet or equal the criteria in the Listing of Impairments in Appendix 1 of the regulations but does prevent the performance of past relevant work (PRW), and that work has been determined to be skilled or semiskilled." *Titles II and XVI: Work Skills and Their Transferability as Intended by the Expanded Vocational Factors Regulations Effective February 26, 1979*, SSR 82-41 (1982). Transferability is defined as the ability to apply "work skills which a person has demonstrated in vocationally relevant past jobs to meet the requirements of other skilled or semiskilled jobs." *Id.* Therefore, "acquired skills are not transferable to unskilled work because, by definition, unskilled work requires no skills." *Transferability of Skills*, Social Security Law and Practice § 43.81; *see also*

3

20 C.F.R. § 416.968(a) ("[U]nskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time," usually within 30 days); *Allen v. Bowen*, 881 F.2d 37, 43 (3d Cir. 1989) ("if the only jobs that a claimant can presently perform are of an unskilled nature, . . . then plainly his former employment has transferred no skills of present value").

When addressing obesity, the ALJ must consider the cumulative effects of obesity on the claimant's ability to perform work-related tasks. *See* 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.00Q. Furthermore, because the social security regulations have no listing for obesity, the ALJ must find that an "individual with obesity 'meets' the requirements of a listing if he or she has another impairment that, by itself, meets the requirements of a listing." *Titles II and XVI: Evaluation of Obesity*, S.S.R. 02-01p (2002). Additionally, an ALJ must "also find that a listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing." *Id.* However, when a claimant argues that his or her obesity in combination with another impairment meets a listing, "the burden is on the [claimant] to demonstrate that the Commissioner's decision is not supported by substantial evidence, and the argument of counsel is simply insufficient to meet this burden." *Cone v. Astrue*, No. 2:07-CV-865-CSC, 2008 WL 2789590, at *3 (M.D. Ala. July 18, 2008) (citations omitted).

## BACKGROUND

The claimant was fifty years old at the time of the administrative hearing. (R. 22). The claimant graduated high school and attended Jacksonville State University for one year. (R. 22). His past work experience includes employment as a box maker, assembler, utility worker, and serviceman. (R. 22). According to the claimant, he became disabled on March 25, 2002 at age forty-

4

five due to Perthes disease (a degenerative hip disease), pulmonary embolus (a blood clot in the lung), deep vein thrombosis (DVT) (a blood clot in a deep vein), obesity, and chronic obstructive pulmonary disease (COPD) (a type of lung disease commonly caused by cigarette smoking). (R. 18). The claimant has not engaged in substantial gainful activity since the alleged onset date. (R. 18).

The claimant testified he experiences a significant amount of pain caused by back, hip, and leg pain. (R. 349). Furthermore, the claimant claims he inherited Perthes disease in his right hip joint and as a result cannot stand or sit for long periods of time. (R. 349). Claimant also injured his right hand in 1997, resulting in a blood clot and surgery to remove the clot, and subsequently developed nerve damage to that hand. (R. 355-56).   Dr. Edward Fisher diagnosed the claimant with degenerative disc disease in April of 2002, only two weeks after the alleged onset date. (R. 351). The claimant further testified that he was hospitalized for chest pain in August of 2006. (R. 357). The examining doctors determined the claimant had deep vein thrombosis with various blood clots. (R. 357).

On April 5, 2002, Dr. Fisher performed an MRI on the claimant and determined that surgery was needed to correct a herniated disc and stenosis at L4-5 and L5-S1. (R. 120). As a result, on May 6, 2002, Dr. Fisher performed a successful L4-5 and L5-S1 laminectomy and discectomy. (R. 120). On July 15, 2002, the claimant, during a follow-up appointment with Dr. Fisher, reported a 50% improvement in his condition. (R. 152). However, the claimant missed an appointment with Dr. Fisher on October 29, 2002, and at that point he ceased attending follow-up appointments with Dr. Fisher. (R. 166).

The claimant testified that, in August of 2006, his leg "gave out" and he collapsed. (R. 357). The claimant also testified that he was having trouble breathing and had chest pains. (R. 357). The

5

claimant was taken to Eliza Coffee Memorial Hospital where doctors diagnosed him with pulmonary embolus and DVT. (R. 313). Upon discharge, physicians instructed the claimant not to drive unless necessary, to divide necessary drives into short increments of time, and to stop every hour to walk if the claimant did have to take a prolonged trip. (R. 358). Additionally, the claimant testified that he was supposed to alternate sitting and standing throughout the day. Finally, the claimant asserted that, if he walks for more than short distances, he experiences pain. (R. 359).

In May of 2005, pursuant to his application for disability, the claimant saw Dr. Gillis for a consultative exam. (R. 20). The claimant weighed 296 pounds and was 72 inches tall. (R. 185). The claimant reported to Dr. Gillis his medical history, including his past herniated disc and stenosis, compression fracture of the dorsal spine, and Perthes disease involving the right hip. (R. 185). Furthermore, the claimant reported daily back pain in his lower back, rating it as a 3-4 on a scale of 10. The claimant also reported to Dr. Gillis that, because of his hip problems, he could only stand for 15 minutes at most, that standing on uneven surfaces increased his pain, and that he was unable to bend at the waist. (R. 185). Similarly, the claimant reported the following facts to Dr. Gillis: his right leg was shorter than his left by three-fourths of an inch; he could not lift more than five pounds without pain; he had trouble sleeping; he wore a back brace intermittently; he did not receive total relief from pain as a result of the surgery by Dr. Fisher or chiropractic visits; he was taking ibuprofen over-the-counter with no prescription medicines; he borrowed Lorcet from family members when his pain level worsened; he had bilateral knee pain; and he had a history of blood clots in his right hand that required surgical removal and subsequent nerve damage. (R. 185).

Upon examination, Dr. Gillis determined that the claimant had difficulty distinguishing between hard and soft touch on the palm of his right hand. (R. 185). Furthermore, the claimant had

normal range of motion in his shoulder, elbow, forearm, and wrist. (R. 185). In the supine position, however, the claimant complained of back pain with the elevation of the right leg at 60 degrees. (R. 186). Claimant was only able to squat approximately one-half of the way down and rise from that position unassisted, stating he could not do more because of knee and back pain. He had normal flexion and extension bilaterally of the knees and normal dorsiflexion, plantar flexion, and inversion and eversion bilaterally of the ankles. (R. 186). Lastly, he had normal range of motion involving the right and the left hip with all maneuvers; however, he did complain of pain in the right hip with those maneuvers. (R. 186).

Dr. Gillis diagnosed the claimant as follows: (1) right hip pain secondary to Perthes disease; (2) spinal stenosis; (3) herniated disc at L4-L5 and L5-S1; (4) status - post laminectomy and disectomy; (5) chronic daily back pain; (6) compression fracture dorsal spine; (7) sensory deficits palmar surface right hand; and (8) bilateral knee pain with Osgood-Schlatter disease involving the left knee. (R. 186).

On November 29, 2006, the date of the ALJ's decision, the claimant was 50 years of age. (R. 347). The ALJ found that the medical evidence indicated that the claimant suffered from Perthes disease, pulmonary embolus, deep vein thrombosis, obesity, and chronic obstructive pulmonary disease. (R. 18). The ALJ then addressed the steps of the sequential evaluation. First, the ALJ found the claimant had not been employed since the alleged onset date. Second, the ALJ found that the claimant's impairments were "severe." However, the ALJ found the claimant's impairments, independently or in combination, were not severe enough to qualify under the Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 18). The ALJ next assessed the fourth and fifth factors of the sequential evaluation. Given his impairments, the ALJ determined that the claimant

could not perform his past relevant work, but that he could perform a limited range of light work. (R. 22-23). The ALJ, in reaching his conclusions, considered all of the aforementioned factors, including both the claimant's complaints as well as the medical records from Dr. Fisher, Dr. Gillis, the state agency physician, and the emergency room doctors. (R. 19).

The ALJ dismissed the claimant's subjective complaints, stating that while evidence of an underlying medical condition existed, the claimant's statements concerning the "intensity, persistence and limiting effects of [the] symptoms [were] not entirely credible." (R. 21). In assessing credibility, the ALJ considered the fact that, other than Dr. Gillis's consultative examination in May of 2002, the claimant had a four-year gap in treatment; the evidence reflected that he consulted no physician from September 3, 2002, when he saw Dr. Fisher post laminectomy and discectomy, until August 13, 2006, when he was admitted to the hospital reporting right leg pain, swelling and some shortness of breath. (R. 20). Additionally, the ALJ considered the lack of evidence in the record that the claimant either took any type of prescription medication or visited a hospital during those four years. (R. 21). As a result of the aforementioned factors, the ALJ stated that "it is reasonable to assume that if the claimant were experiencing physical difficulties to a disabling degree, he would have presented for follow up care with Dr. Fisher or presented to the hospital/emergency room for treatment." (R. 21).

The ALJ also addressed the transferability of the claimant's job skills, stating that whether the claimant's job skills were transferable was not material to the determination of disability in this case. The ALJ used the Medical-Vocational Rules as a framework in reaching that decision, stating that the claimant would be found "not disabled," regardless of whether the claimant had transferable job skills. However, to be comprehensive, the ALJ enlisted a Vocational Expert to assist in

8

determining the claimant's status. The Vocational Expert expressed the opinion that the claimant was unable to perform any of his past jobs, but that someone in the claimant's condition and with the claimant's age, education, and prior work history would be able to perform some light duty, unskilled jobs, such as a labeler or packing line worker. (R. 366). As a result, the ALJ found that whether the claimant's job skills were transferable to the types of jobs suggested by the vocational expert was immaterial to the question regarding the claimant's disability.

The ALJ concluded that the claimant could perform work in jobs that exist in significant numbers in the national economy. (R. 22). Therefore, the ALJ found that the claimant was not disabled. (R. 23).

## DISCUSSION

**I. Substantial evidence supports the ALJ's finding that whether the claimant's job skills from his past work were transferable was not material to the determination of disability in this case.**

The claimant argues that the ALJ erred in failing to use the claimant's correct age at the time of his administrative hearing, which was 50 years of age. The claimant asserts that had the ALJ used the proper age, the ALJ's RFC finding of sedentary work capabilities would have made the issue of whether the claimant's job skills were transferable material to the disability determination. In other words, the claimant asserts that, using a "non mechanical application of the Medical Vocational Rules," transferability of skills would be material to the determination of disability (Pl. Br. 4). As a result, the claimant argues, under the Medical Vocational Rules, he would be found disabled.

The ALJ, however, found the claimant capable of performing a number of light work, unskilled jobs. (R. 22). In reaching that conclusion, the ALJ noted that "[t]ransferability of job skills [was] not material to the determination of disability because using the Medical-Vocational Rules as

a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills." (R. 22).

Because of the complicated nature of the claimant's impairments, the ALJ correctly enlisted a vocational expert. *See Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987) ("exclusive reliance on the grids is not appropriate either when a claimant is unable to perform a full range of work at a given functional level or when a claimant has non-exertional impairments that significantly limit basic work skills. . . . When the grids are not controlling, the preferred method of demonstrating job availability is through expert vocational testimony"). The vocational expert testified that the claimant, taking into account his age, impairments, and relevant past work, is capable of performing several light duty, unskilled jobs that exist in the national economy. (R. 368).

The claimant asserts that the transferability of his skills is relevant to the disability determination and that the ALJ erred in not considering it. Prior experience in skilled or semi-skilled work activities can be transferred to meet the requirements of other skilled or semi-skilled jobs or kinds of work. 20 C.F.R. § 404.1568 (d)(1). As several circuits have pointed out, however, "[s]kills are not transferable to unskilled work because, by definition, unskilled work requires no skills." *Terry v. Sullivan*, 903 F.2d 1273, 1277 (9th Cir. 1990); *see also Allen v. Bowen*, 881 F.2d 37, 43 (3d Cir.1989) ("if the only jobs that a claimant can presently perform are of an unskilled nature, . . . then plainly his former employment has transferred no skills of present value"). The social security regulations provide for a more rigorous inquiry into the transferability of skills for persons of advanced age; however, the regulations define advanced age as "age 55 or older." 20 C.F.R. § 404.1568(d)(4). Thus, the claimant would not qualify for consideration under the advanced age provision, because even at the time of his hearing he was only 50 years old. Therefore, because

every job the vocational expert testified the claimant could perform was "unskilled" in nature (R. 368), whether the claimant possesses any job skills capable of transferring to one of the potential jobs is irrelevant. Thus, the ALJ correctly concluded that the transferability of the claimant's skills was irrelevant to his RFC and disability determinations.

## II.     Substantial evidence supports the ALJ's Residual Functional Capacity findings.

The claimant argues that substantial evidence does not support the ALJ's residual functional capacity ("RFC") finding and that the ALJ erred in concluding that the claimant is able to perform a number of light duty jobs in the national economy.  Instead of identifying a specific error for the court to consider, the claimant's strategy appears to be pointing broadly at the RFC finding of light work capacity, hoping that the court will discover a reversible error. The court nevertheless concludes that substantial evidence supports the RFC finding of the ALJ.

"Light work," as defined by the Social Security Administration, involves:

lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities. If someone can do light work, this court will determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

*Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir. 1987) (citing 20 C.F.R. § 416.967).

The ALJ concluded that the claimant "has the residual functional capacity to lift 20 pounds occasionally and frequent lift or carry objects weighing 10 pounds. He can stand for 4 hours and sit for 4 hours in an 8-hour day with the ability to sit/stand at will throughout the day." (R. 19). Thus, the ALJ's findings fit within the "light duty" standard. The ALJ also agreed with the state agency

11

physician and concluded that the claimant has unlimited use of his hands. The claimant argues that the ALJ should have accorded more weight to Dr. Gillis's finding that the claimant had some difficulty distinguishing between hard and soft touches on his right palm. (R. 19). However, no evidence in the record suggests that this difficulty would limit the claimant's ability to perform the types of light duty work outlined by the vocational expert. Furthermore, the state agency physician determined that the claimant's hands had no "manipulative limitations." (R. 190). In fact, the physician stated that the claimant's grip strength and dexterity were "unremarkable." (R. 190). The court finds that substantial evidence exists in the record to support the ALJ's finding that any sensation difficulties in the right hand would not constitute a disability.

The ALJ also concluded that the claimant would not be able to use his right leg, but could use his left leg. (R. 19). In reaching these conclusions, the ALJ's opinion considered every medical examination the claimant incurred. None of those records includes a *doctor's opinion* that the claimant is disabled or has limitations beyond those listed in the ALJ's opinion. (R. 21). In fact, Dr. Fisher, the doctor who performed the claimant's back surgery in 2002, allowed the claimant to return to work in 2002. (R. 167). The claimant ceased visiting Dr. Fisher after his release to work. (R. 166). The claimant subsequently failed to see a physician for approximately four years during the time of the alleged disability;  the lack of medical evidence from 2002 until 2006 suggests the claimant was and is not disabled.  Beginning in 2006, the claimant visited several doctors. The record includes medical evidence from the emergency room visit in 2006, Dr. Gillis's notes from the consultative exam, and the state agency physician's conclusions. While all of these doctors suggested the claimant had several impairments, none suggested that the claimant was impaired beyond what the ALJ's opinion suggested. Substantial evidence, therefore,  supports the ALJ's conclusions regarding

12

the nature and severity of the claimant's impairments.

Dr. Gillis's records reveal the claimant complained of pain and other limitations, but these complaints were subjective and not completely supported by the doctor's objective findings. Addressing those subjective complaints of pain, the ALJ properly applied the three-part pain standard.  First, the ALJ found that the claimant suffered from several medical impairments. (R. 21). However, the ALJ, while addressing the next steps of the pain standard, discredited the claimant's subjective complaints by noting that several of his activities were inconsistent with the alleged disabilities and symptoms. (R. 21). The Eleventh Circuit has stated that "[a] claimant's daily activities may be considered in evaluating and discrediting complaints of disabling pain." *Harwell v. Heckler*, 735 F.2d 1292, 1293 (11th Cir. 1984). In addressing the claimant's daily activities, the ALJ noted that the claimant, prior to his emergency room visit in 2006, had traveled for several weeks and he may have been in a car for 7 to 8 hours per day. (R. 20). Additionally, the claimant reportedly socializes at bars with friends and smokes 40 to 50 packs of cigarettes per year. (R. 20). Lastly, the claimant testified that he neither wanted nor took pain medication. (R. 363). The ALJ considered this testimony and found that it contradicted the claimant's statements about the severity of his condition and his pain. A reversal is warranted if the ALJ's decision contains no evidence of the proper application of the three-part pain standard. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). However, the ALJ in this case properly applied the pain standard and discredited the claimant's subjective complaints using evidence from the record.

The ALJ properly considered all of the evidence and made a determination concerning the available objective medical evidence and the credibility of the claimant's testimony. Despite the claimant's assertion that the ALJ virtually ignored Dr. Gillis's report, the record shows that the ALJ

carefully considered Dr. Gillis's report and weighed the doctor's opinions and facts expressed in his report.  Although Dr. Gillis reported that the claimant suffered from several impairments, the doctor did not state that the claimant was unable to perform the types of jobs the vocational expert recommended (i.e., light duty work). To the contrary, the only evidence available that suggests the claimant would not be able to perform light duty work is the claimant's own subjective complaints, which the ALJ discredited. As a result, the ALJ's findings are supported by the medical evidence of record. The court concludes, therefore, that substantial evidence supports the RFC finding of the ALJ.

**III.  The ALJ adequately considered the claimant's obesity when addressing the claimant's alleged disability.**

The claimant next argued that the ALJ failed to adequately consider obesity. The ALJ, in acknowledging the claimant's obesity, stated that "[t]he record does not indicate that a treating or examining physician has suggested that the claimant's weight significantly limited him or caused him any problems with musculoskeletal impairments." (R. 21).  As a matter of law, the ALJ must consider the effects of obesity in conjunction with the claimant's other impairments when determining the claimant's ability to return to past relevant work.  *See Shellhouse v. Barnhart*, 395 F. Supp. 2d 1136, 1140 (N.D. Ala. 2005). The ALJ must consider the cumulative effects of obesity on the claimant's ability to perform work-related tasks. *See* 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.00Q.

Contrary to the claimant's assertions, the ALJ did find the claimant's obesity to be a severe impairment. However, the ALJ stated that the obesity has not combined with his other impairments to impact his musculoskeletal system or general health in such a way that his treating doctors would

14

have diagnosed him with impairments secondary to or in combination with obesity. (R. 21). In other words, the ALJ found that the claimant's obesity was a severe impairment, but that the claimant's obesity did not, however, combine with another severe impairment to meet step 3 of the sequential evaluation. Therefore, the ALJ merely moved on to the subsequent steps of the process.

The court finds that the ALJ properly relied on the medical records, as well as other corroborating medical evidence, in determining that the cumulative effect of the claimant's obesity would not be bar him from performing light work. *See Rutherford v. Chater*, 399 F.3d 546, 552-53 (3d Cir. 2005) (concluding that the ALJ's reliance on opinion of physician who was aware of claimant's obesity constituted a satisfactory consideration of that condition); *Cone v. Astrue*, No. 2:07-CV-865-CSC, 2008 WL 2789590, at *3 (M.D. Ala. July 18, 2008) (affirming the decision of the ALJ where "the objective medical evidence of record does not demonstrate that any treating or consultative physicians placed limitations on [the claimant] due to her obesity"). While the court recognizes that obesity, alone or in combination with other impairments, can significantly impact one's ability to work, the court notes that the claimant bears the burden of providing evidence to the Commissioner of such disabling effects.  The record is void of any such evidence, and the claimant thus failed to meet his burden.

## CONCLUSION

For the reasons stated above, the court concludes that the decision of the Commissioner is supported by substantial evidence and is due to be AFFIRMED. A separate order to that effect will be entered simultaneously.

DONE and ORDERED this 1st day of October, 2008.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE